# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Appeal Nos.  03-1100, 03-1113 |
| Plaintiff, | ) | 03-1195 |
| | ) | |
| | ) | (On limited remand) |
| v. | ) | |
| | ) | |
| MICHAEL SPANO, SR., EMIL SCHULLO, | ) | No. 01 CR 30 |
| and JAMES INENDINO. | ) | |
| | ) | Judge Ruben Castillo |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The defendants in this public corruption case seek to have their sentences reduced via new opportunities provided by United States v. Booker, 125 S. Ct. 738 (2005). The defendants' direct appeal of their convictions before this Court were still pending more than two years after their sentencing when the Supreme Court dramatically changed the world of federal sentencing in its Booker decision on January 12, 2005. Subsequent to this decision, each Circuit has struggled to determine how it would apply Booker to cases pending on appeal. In the Seventh Circuit, United States v. Paladino, 401 F.3d 471 (7th Cir. 2005), determined that all cases pending on appeal would generally be remanded back to the district court for general reevaluation in light of Booker's determination that the Sentencing Guidelines were no longer binding and mandatory.

On March 24, 2005, the Seventh Circuit affirmed the defendants' convictions and ordered a limited remand to this Court pursuant to Paladino for proceedings to determine whether this Court would have imposed different sentences in this case if allowed to re-sentence. See United States v. Spano, 401 F.3d 837, 842-43 (7th Cir. 2005). This Court followed the suggested Paladino procedure and requested briefing on this issue from the parties. This procedure requires a district court judge

to attempt to go back in history to the initial sentencing hearings for all affected defendants. After careful evaluation of the parties' submissions, the sentencing transcript and the pre-sentence reports, this Court has decided to hew to its original sentences for the reasons set forth herein.[1]

## RELEVANT FACTS

### A.    Trial Evidence

The facts surrounding the convictions of the Michael Spano, Sr., Emil Schullo, and James Inendino (collectively, "defendants") were more than adequately summarized by the Seventh Circuit Court of Appeals. See Spano, 401 F.3d at 838-39. A jury found Emil Schullo ("Schullo"), the Director of Public Safety for the Town of Cicero, Illinois, guilty of accepting a bribe valued at $5000 or more in violation of 18 U.S.C. § 666(a)(1)(B), and of the theft of at least $5000 from a federally-funded program in violation of § 666(a)(1)(A). His co-defendants, Michael Spano ("Spano") and James Inendino ("Inendino"), were charged and convicted of, among other offenses, paying the bribe in violation of § 666(a)(2), and aiding and abetting the theft in violation of 18 U.S.C. § 2 and § 666(a)(1)(A). The jury also found all three men guilty of conspiring to embezzle, steal, or obtain by fraud monies owned by an organization receiving federal funds, namely, the Town of Cicero, under 18 U.S.C. § 371 and § 666(a)(1)(A).

Schullo's responsibilities as Cicero's Director of Public Safety included oversight of the town's police, fire, and health departments. The charges in this case arose out of a private investigation initiated by Schullo to determine whether three police officers lived outside of Cicero's

---

[1]This Court purposely delayed issuing this opinion until after the parties' Paladino briefing for two reasons: (1) to allow this Circuit's post-Booker case law to develop; and (2) to avoid unduly influencing re-sentencing proceedings that were pending before Judge Grady involving Spano and Schullo.

boundaries in violation of a town ordinance. The ordinance required that town employees, including police officers and firefighters, live within the town limits. The investigation was allegedly prompted by a formal labor grievance filed by the town's firefighters, who initially discovered that the three police officers lived outside Cicero. The firefighters' grievance claimed that the residence requirement for town employees was being applied disparately and that they too should be allowed to live outside Cicero's boundaries.

Evidence at trial showed that the Town of Cicero paid $75,831.24 for the investigation commissioned by Schullo—an investigation that in reality had only $34,456.90 in expenses associated with it, although apparently none of the money was ever used to resolve the firefighters' grievance. The remaining $41,374.34 paid by the town was divided up among the various co-conspirators, including Schullo, Spano and Inendino.

As shown by the trial evidence, this was a classic case of public corruption. The defendants stole public funds from the Town of Cicero thanks to the corrupt services of Schullo who theoretically was supposed to be serving as Cicero's Chief of Police and Director of Public Safety. Through their criminal scheme, the defendants stole monies from the Town of Cicero through false and inflated billings invoiced to the Town in connection with its investigation into whether its police officers were living within Cicero as required by Town ordinance. Each of the defendants had a designated role to play in making the criminal scheme work. In carrying out their roles, the defendants all had contact in varying degrees with Sam Rovetuso, a convicted felon who was cooperating with the government at the time of this investigation, and who recorded numerous conversations with the defendants outlining their participation in the crimes. Mr. Rovetuso died in 1999 from leukemia.

-3-

The criminal venture itself had three main phases. First, the defendants defrauded the Town of Cicero through false billings for work performed at defendant Schullo's request. Schullo received a 10% kickback for providing this fraudulent opportunity, and the other defendants were paid by inflated billings to the Town. This portion of the criminal scheme was charged in Counts One through Four of the indictment.

Second, the defendants laundered the proceeds of the theft/kickback scheme through the currency exchange at which Inendino worked, the Taylor-Ogden Currency Exchange. The Town of Cicero issued six checks as a result of the criminal scheme. The first three checks were cashed directly at the Taylor-Ogden Currency Exchange, and the cash was split up amongst the conspirators. Spano believed that there was too much risk having the checks cashed directly at the currency exchange, so the last three checks were deposited into the bank account of Rovetuso's mother, and then checks written on that account were cashed at the currency exchange and at the account holder's bank. This cash was then distributed amongst the conspirators. This laundering activity was charged in Counts Five through Eleven of the indictment; Spano and Inendino were named in these counts.

Third, and lastly, in order to further conceal their receipt of income from the Town of Cicero, the defendants agreed to have Rovetuso report the entirety of the income on his 1995 and 1996 tax returns. The other defendants did not report this income on their own returns. Spano and Inendino agreed to pay Rovetuso a proportionate share of the resulting tax liability "under the table." This activity was charged in Count Twelve of the indictment.

B.    Sentencing Proceedings

    1.    **Michael Spano, Sr.**

On January 2, 2003, this Court held a sentencing hearing and sentenced Spano to a total term

of imprisonment of seventy-two months on each of Counts Two, Four, and Five through Eleven, and

sixty months on each of Counts One and Twelve, all terms to be served concurrently. In addition,

this Court imposed a term of supervised release of three years on each count of conviction, all terms

to run concurrently; the requisite $1,100 special assessment; a fine of $8000; and joint and several

restitution in the amount of $75,831.24 as well as forfeiture in the amount of $41,374.34. (R. 236;

Sentencing Tr. at 54-55, 64.)

This Court calculated defendant Spano's sentence first by calculating the adjusted offense

levels for four separate groups of offenses: Counts One and Four (Conspiracy to Commit Theft of

Government Funds); Count Two (Bribery); Counts Five through Eleven (Conspiracy to Commit and

Committing Money Laundering); and Count Twelve (Conspiracy to Impede, Impair, Obstruct, or

Defeat Tax).

With respect to Counts One and Four (Theft), this Court determined the base offense level

to be six, pursuant to U.S. Sentencing Guidelines Manual ("Guideline") §§2X1.1, 2B1.1(a) (2005).[2]

(Sentencing Tr. at 17.) This Court then found three enhancements: (1) an eight level increase

because this Court determined that the loss amount to the Town of Cicero recommended by the

government and the probation officer of $75,831.24 was "appropriately calculated" (id. at 28); (2)

a two level increase because this Court agreed with the probation officer that sophisticated means

were used pursuant to Guideline §2B1.1(b)(8)(c) (2005) (id. at 17); and (3) a four level increase

---

[2]The effective date of these Guideline sections is November 1, 2001.

because this Court found that "this offense is one that has the requisite number of people" and "[i]n the alternative,. . . that this offense, because of the manner in which it occurred, not only in the investigation part of it but with regard to the payment part of it, is an offense that is otherwise extensive." (Id. at 18). Specifically, this Court stated that "[h]aving sat through the entire trial, there is no question in this Court's mind that Mr. Spano was, in fact, the organizer of this particular criminal conspiracy to obtain money from the Town of Cicero." (Id.) This Court thus found Spano's adjusted offense level for Counts One and Four to be twenty. (Id. at 17.)

With respect to Count Two (Bribery), this Court accepted as correct "the analysis that's contained in the Presentence Investigation Report." The Report calculated an adjusted offense level for Count Two pursuant to: (1) Guideline §§2C1.1(a) (base offense level ten); (2) §§ 2C1.1(b)(2)(A) and (B) (eight level increase for loss exceeding $70,000 and/or bribery of individual in high-level decision making position); and (3) § 3B1.1(a) (four level increase for role in the offense). These calculations resulted in an adjusted offense level of level twenty-two. (Sentencing Tr. at 20.)

With respect to Counts Five through Eleven (Money Laundering), this Court determined the base offense level to be eighteen pursuant to Guideline §2S1.1(a), which looks to the highest base level for the underlying offense used to derive the laundered funds – in this case, bribery, which has a base offense level of eighteen under Guideline §§ 2C1.1(a) and (b)(2). (Sentencing Tr. at 4-5, 26-28.) This Court then found three enhancements: (1) a two level increase pursuant to Guideline §2S.1(b)(2)(B) because this Court agreed with the probation officer that Spano's conviction was for an offense under 18 U.S.C. § 1956; (2) a two level increase for sophisticated laundering pursuant to Guideline §2S1.1(b)(3) (Sentencing Tr. at 4-5, 26-28); and (3) a four level enhancement pursuant to Guideline §3B1.1(a) because this Court found that Spano was the organizer and leader of the

-6-

money laundering conspiracy, which was otherwise extensive. (Sentencing Tr. at 18.) This Court thus found Spano's adjusted offense level for Counts Five through Eleven to be twenty-six. (Id. at 28-29.)

With respect to Count Twelve (Tax Fraud Conspiracy), this Court accepted the probation officer's calculation that the base level for this offense, under Guideline §§2T1.1(a) and 2T1.9(a)(2), is level ten. That level was then enhanced by four levels since Spano was the leader and organizer of this particular conspiracy.

Finally, this Court calculated the total offense level. Pursuant to Guideline §3D1.2(b), the bribery and theft convictions in Counts One, Two and Four were combined into a single group with the money laundering convictions in Counts Five through Eleven, because the counts involved the same victim and two or more acts or transactions connected by a common criminal objective or part of a common scheme or plan. Count Twelve, the tax conspiracy count, was not grouped with the other crimes since it was a separate harm. Pursuant to Guideline §3D1.3, the combined offense level for Counts One, Two, Four, and Five through Eleven is twenty-six, which is the offense level for the money laundering offenses. Under Guideline §3D1.4, the applicable combined adjusted offense level is twenty-six, since the tax count had no effect on the overall Guideline score, resulting in a total offense level of twenty-six. (Sentencing Tr. at 28.)

This Court also denied the government's motion for an upward departure of two levels based on Spano's use of his organized crime ties to access the Town of Cicero and its public officials and initiate and complete the crimes of conviction. This Court found that the government failed "to meet its burden of establishing some link by a preponderance of the evidence between the charged offenses and the alleged organized crime" ties. (Id. at 39-40.)

This Court found Spano's criminal history category to be Category I, which, together with the total offense level of twenty-six, resulted in a range of imprisonment of sixty-three to seventy-eight months under the Guidelines. (Id. at 18.) This Court sentenced Spano to seventy-two months imprisonment, above the mid-range of the calculated Guideline range. In doing so, this Court noted:

> Well, I sat through the entire trial, and I sat through it with a lot of sadness, for what occurred in the Town of Cicero as far as I could see took political corruption to a new level. I have never seen another case like this . . . . As far as I'm concerned with regard to this case, this is no different than taking every single citizen in the Town of Cicero, locking them up in some room and saying you cannot leave until you hand over $20 to me because what occurred here is no different than that. . . . Mr. Spano, I don't sentence you on the basis of who your friends are, but this case is no different than you pulling up your vehicle . . . to the Town of Cicero bank account and just saying give me mine for whatever reason. . .
>
> When I look at the Sentencing Guideline range, I find it totally appropriate for the offense that's before me. . . .

(Id. at 53-54).

### 2.    Emil Schullo

During the January 2, 2003 sentencing hearing, this Court sentenced Schullo to a total term of imprisonment of thirty-seven months on each of Counts One, Three, and Four, all terms to be served concurrently. In addition, this Court imposed a term of supervised release of three years on each count of conviction, such terms to run concurrently; the requisite $300 special assessment; a fine of $6000; and joint and several restitution in the amount of $75,831.24. (R. 237; Sentencing Tr. at 55-56.)

This Court calculated Schullo's sentence first by calculating the adjusted offense levels for two separate groups of offenses: Counts One and Four, Conspiracy to Commit Theft of Government Funds; and Count Three, Soliciting and Receiving Bribes.

With respect to Counts One and Four (Theft), this Court determined the base offense level to be four, pursuant to Guideline §§2X1.1, 2B1.1(a) (eff. 11/1/01). (Sentencing Tr. at 4-5, 16-17.) This Court then found four enhancements: (1) an eight level increase because this Court found that the loss amount to the Town of Cicero recommended by the government and the probation officer of $75,831.24 was "appropriately calculated" (Id. at 28); (2) a two level increase because this Court agreed with the probation officer that there was more than minimal planning pursuant to Guideline §2B1.1(b)(4)(A) (Sentencing Tr. at 17); (3) a two level increase because Schullo abused his position of public trust pursuant to Guideline § 3B1.3; and (4) a three level increase pursuant to Guideline § 3B1.1(b) because this Court found that "this offense is one that has the requisite number of people" and/or, "[i]n the alternative, . . . that this offense, because of the manner in which it occurred, not only in the investigation part of it but with regard to the payment part of it, is an offense that is otherwise extensive." (Sentencing Tr. at 18.) Specifically, this Court stated:

> "I do believe and do conclude by a preponderance of evidence that Mr. Schullo played a managerial role in guiding this offense. That is, in knowing how this could be done, how it could be paid out and how, when necessary, certain documents were drawn out. . . . [W]hat is key to me was that, as you recalled with these bogus residency reports, and there's no doubt in my mind, having looked at the reports, I also conclude, as I think the jury did by its verdicts, that these reports were, in fact, bogus reports."

(Id. at 18-19). This Court thus found Schullo's adjusted offense level for Counts One and Four to be nineteen. (Id. at 17, 26).

This Court determined that the adjusted offense level for Count Three (Soliciting and Receiving Bribes) was less than for Counts One and Four. For the record, this Court accepted as correct "the analysis that's contained in the Presentence Investigation Report," which calculated an

adjusted offense level of eighteen pursuant to Guideline §2C1.1(a) (base level ten) and enhancements under Guideline §2C1.1(b)(2)(A) and (B) (eight level increase). (Sentencing Tr. at 20.)

Finally, this Court calculated the total offense level. Counts One, Three and Four were combined into a single group pursuant to Guideline §3D1.2(b), because those counts involved the same victim and two or more acts or transactions connected by a common criminal objective or part of a common scheme or plan. Pursuant to Guideline §3D1.3, the combined offense level for Counts One, Three and Four is nineteen, the offense level for the theft offenses. Under Guideline §3D1.4, the applicable combined adjusted offense level is nineteen, resulting in a total offense level of nineteen. (Sentencing Tr. at 26.)

Finally, as with Spano, this Court denied the government's motion for an upward departure of two levels based on what the government asserted were defendant Schullo's organized crime ties. This Court held that the government failed "to meet its burden of establishing some link by a preponderance of the evidence between the charged offenses and the alleged organized crime," because this Court found that the government did not establish that organized crime played any role in the offenses. (Sentencing Tr. at 39-40.)

Schullo's total offense level of nineteen and his criminal history category of Category I resulted in a range of imprisonment of thirty to thirty-seven months under the Guidelines. (Id. at 26.) This Court sentenced Schullo to thirty-seven months' imprisonment, the highest end of the calculated Guideline range. (Id.) In doing so, this Court noted:

> I have to tell you, Mr. Schullo, that if I have anything to do with it, either now or in the future, this Sentencing Guideline range would be totally different than the one before me. I don't believe that the public corruption Guidelines are sufficient at this point in time nor have they been sufficient in the past. And maybe I'm colored by the experience that I've had in my life time, but be that as it may, I've already given

you the benefit of one sentencing decision. I have to tell you that I find the Guideline range of 30 to 37 months totally inadequate.

(Id. at 55-56).

### 3. James Inendino

At the January 15, 2003 sentencing hearing, this Court sentenced Inendino to a total term of imprisonment of seventy-eight months on each of Counts Two, Four, and Five through Eleven, and sixty months on each of Counts One and Twelve, all terms to be served concurrently. In addition, this Court imposed a term of supervised release of three years on each count of conviction, all terms to run concurrently; the requisite $750 special assessment; a fine of $50,000 - later reduced to $5,000;[3] and joint and several restitution to the Town of Cicero in the amount of $75,831.24, as well as forfeiture in the amount of $41,374.34. (R. 247, 255: Sentencing Tr. at 33-34, 40-41.)

This Court calculated Inendino's sentence first by calculating the adjusted offense levels for four separate groups of offenses: Counts One and Four (Conspiracy to Commit Theft of Government Funds); Count Two (Bribery); Counts Five through Eleven (Conspiracy to Commit and Committing Money Laundering); and Count Twelve (Conspiracy to Impede, Impair, Obstruct, or Defeat Tax).

With respect to Counts One and Four (Theft), this Court determined the base offense level to be six pursuant to Guideline §§2X1.1, 2B1.1(a) (eff. 11/1/01). (Sentencing Tr. at 7.) This Court then ruled on three enhancements, finding: (1) an eight level increase because the loss amount to the Town of Cicero recommended by the government and the probation officer of $75,831.24 was appropriately calculated (id. at 8); and (2) a two level increase because the probation officer correctly determined sophisticated means were used pursuant to Guideline §2B1.1(b)(8)(C). (Sentencing Tr.

---

[3] This Court initially included a fine of $50,000 as part of its sentence. R. 247. This Court reduced the fine to $5,000 upon motion of the defendant. R. 255.

-11-

at 7, 10.) Unlike with Spano and Schullo, this Court declined to follow the probation officer's recommendation to enhance Inendino's sentence for his role in the offense pursuant to Guideline §3B1.1. (Sentencing Tr. at 7, 12-13.) This Court explained: "I don't believe that Mr. Inendino should have any increase for role in the offense. I see him as a participant in this offense, an important participant, but not an organizer of this particular activity, such as it was." (Id.) However, this Court also declined Inendino's invitation to find him to be a minor or minimal participant in the offense, stating that "because I do think he played a key role in the offense, at least key enough to bring certain prongs of the offense together, I don't believe any decrease is appropriate." (Id.) This Court thus found Inendino's adjusted offense level for Counts One and Four to be sixteen. (Id.)

With respect to Count Two (Bribery), this Court adopted the "Presentence Investigation Report in whole," with the exception of the role in the offense enhancement under Guideline §§3C1.1, as noted herein. (Id. at 7, 12-13.) This Court rejected the government's request for a two level increase for obstruction of justice based on Inendino's payment of a $1000 bribe to a city official while out on bond in this case. In doing so, this Court stated that "that conduct, as reprehensible as it is, is not related to the offense of conviction and is not a closely related offense, so I'm not using that adjustment." (Id. at 13.) This Court then calculated an adjusted offense level for Count Two, pursuant to Guideline §§2C1.1(a) and 2C1.1(b)(2)(A) and (B), of eighteen. (Sentencing Tr. at 13.)

With respect to Counts Five through Eleven (Money Laundering), this Court determined the base offense level to be eighteen pursuant to Guideline §2S1.1(a), which looks to the highest base level for the underlying offense used to derive the laundered funds – in this case, bribery, which has a base offense level of eighteen under Guideline §2C1.1(a) and (b)(2). (Sentencing Tr. at 7, 13.)

This Court then ruled on two enhancements, finding: (1) a two level increase in accord with the probation officer's assessment that pursuant to Guideline §2S1(b)(2)(B), Inendino's conviction was for an offense under 18 U.S.C. §1956 (Sentencing Tr. at 7); and (2) a two level increase for sophisticated laundering pursuant to Guideline §2S1.1(b)(3), "given the way the money was, in fact, handled." (Sentencing Tr. at 8-9, 12.) This Court thus found Inendino's adjusted offense level for Counts Five through Eleven to be twenty-two. (Id. at 7, 14.)

With respect to Count Twelve (Tax Fraud Conspiracy), this Court accepted the probation officer's calculation that the base offense level under Guideline §§2T1.1(a) and 2T1.9(a)(2) is level ten. (Sentencing Tr. at 7, 14.)

This Court then calculated the total offense level. Counts One, Two and Four (Bribery and Theft) were combined into a single group with Counts Five through Eleven (Money Laundering) pursuant to Guideline §3D1.2(b), because the counts involved the same victim and two or more acts or transactions connected by a common criminal objective or part of a common scheme or plan. Count Twelve, the tax conspiracy count, was not grouped with the other crimes because it was a separate harm. Pursuant to Guideline §3D1.3, the combined offense level for Counts One, Two, Four, and Five through Eleven is twenty-two, the offense level for the money laundering offenses. Under Guideline §3D1.4, the applicable combined adjusted offense level is twenty-two, since the tax count had no effect on the overall Guideline score, resulting in a total offense level of twenty-two. (Sentencing Tr. at 13-14.)

This Court denied the government's motion for three upward departures. First, the Court denied the government's motion seeking an overall obstruction of justice enhancement pursuant to Guideline §3C1.1. Although the Court agreed that Inendino's statements to his probation officer

were vastly different from the facts proved in the case – e.g., that he had no knowledge of the Schullo bribery or the theft from the Town of Cicero and that he was not involved in the subsequent tax cover-up – "in the exercise of [its] sentencing discretion," this Court would not enhance Inendino's sentence on this basis, "given Mr. Inendino's reliance on counsel under the circumstances presented in this case." (Sentencing Tr. at 15-16, 21.)

Second, this Court declined to impose a two level upward departure based on Inendino's use of his organized crime ties to access the Town of Cicero and to commit the crimes of conviction, finding a failure of proof connecting the alleged organized crime ties and this particular offense. (Id. at 6-7.) Third, this Court declined to grant the government's request for an upward departure pursuant to Guideline §4A1.3 to reflect the seriousness of the Inendino's past criminal conduct, which the government argued was not fully accounted for in the criminal history category computations because two old felony convictions were not counted and Inendino was likely to commit further crimes. (Sentencing Tr. at 16-17.) This Court disagreed, finding that the two convictions were properly excluded based on their age, and the criminal history category was appropriate. (Id. at 21-22.) This Court stated: "I'm not going to upward depart, in the exercise of my discretion, knowing that I could." (Id. at 22.)

This Court thus found Inendino's total offense level to be twenty-two and his criminal history category to be Category IV, which under the Guidelines resulted in a range of imprisonment of sixty-three to seventy-eight months. (Id. at 14). This Court then sentenced Inendino to seventy-eight months imprisonment, at the highest end of the calculated Guideline range. (Id. at 33). In doing so, this Court noted:

Okay. Well, Mr. Inendino, you're 60 years old. You've got six federal convictions at this point. In no uncertain terms, the sentence I will impose today is meant to totally retire you because even though people live a lot longer than they used to, it would be totally ridiculous for you to go out and get another conviction for whatever reason. . . .

\* \* \*

Now, this crime in Cicero, it's not the crime of the century; but it sure does and I said this before, reach new levels. It was the looting of the Town of Cicero. And you were around, and you got together with Mr. Rovetuso and the other people involved in this case, and in no uncertain terms you wanted your piece of the action, and you were concerned about what's my cut.

\* \* \*

In particular, with regard to you, now, I sit here as a federal judge and I see a lot of people that are the failure of the state criminal justice system. I see them all the time. But I don't see too many people that are the failure – and you're Exhibit A – that represents the failure of the federal criminal justice system.

\* \* \*

When I look at you, I see somebody, on the one hand, who's a good family man but is a total contradiction. Do I believe, as somebody who grew up on the West Side, that from 1980-something, whenever you got out of federal jail, 'til now you were a law-abiding citizen? I wouldn't put any money on that. I just think that it turned out that Mr. Rovetuso, as much as Mr. Rovetuso is not necessarily the person I would be spending any time with, just happened to be the one who was willing to cooperate with the federal government and result in a conviction. And there's also no doubt in my mind that if at any point that Mr. Rovetuso was wearing that wire that anyone involved in this conviction found out that Mr. Rovetuso was wearing that wire, I think he would have seen His Maker a lot sooner than he otherwise did.

So, taking all of this big mosaic into consideration, I need to send a message to you in no uncertain terms, Mr. Inendino, that you need to be retired totally from the federal criminal justice system. And I see absolutely no reason, having given you the benefit of sentencing decisions that probably many others would not, to not sentence you at the high end of the Sentencing Guidelines.

\* \* \*

And let me just say that if you come out from this sentence that I'm imposing today . . . and you commit any other federal violation, . . . that will not be a day that I will not hesitate to sentence you to the very maximum of my sentencing discretion, and I want you to know that. You need to retire. Enough is enough, and the citizens of this district have had enough.

(Id. at 29-33.)

## ANALYSIS

The sentencing of criminal defendants in the federal system is ultimately governed by 18 U.S.C. § 3553(a). Booker, 125 S. Ct. at 750. That subsection first requires that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" 18 U.S.C. § 3553(a)(2). According to this section, the sentence must:

    (A)    reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    afford adequate deterrence to criminal conduct;

    (C)    protect the public from further crimes of the defendant; and

    (D)    provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2). After this general mandate, section 3553(a) lists seven factors for the court to consider "in determining the particular sentence to be imposed." In addition to the factors set forth at section 3553(a)(2) quoted above, the court is to consider:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    ...

    (3)    the kinds of sentences available;

(4) the kinds of sentences and the sentencing range established [under the Sentencing Guidelines], subject to any amendments made to such Guidelines by an act of Congress...;

(5) any pertinent policy statement ... issued by the [United States] Sentencing Commission ... subject to any amendments made to such policy statement by an act of Congress...;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Yet within this general statutory sentencing scheme, the Sentencing Guidelines provide a critical framework because they represent eighteen years' worth of careful consideration of the proper sentences for federal offenses. See United States v. Mykytiuk, 415 F.3d 606, 608 (7th Cir. 2005). In Mykytiuk, a thoughtful opinion authored by Judge Wood, the Seventh Circuit Court of Appeals indicated that the Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country and, therefore, held that a sentence properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness. Id. Mykytiuk expressly acknowledged that the Sentencing Guidelines represented eighteen years' worth of careful consideration of the proper sentences for federal offenses. Id. at 60.

Other Courts of Appeals throughout the country have also reiterated the central importance of the initial Sentencing Guideline range in the post-Booker determination of a reasonable sentence. See e.g., United States v. Guerrero-Velasquez, No. 05-30066, 2006 WL 133494, at *1 n.1 (9th Cir. Jan. 19, 2006) (a sentence suggested by the Guidelines is presumptively reasonable, and the Guidelines are still an important aid for district judges seeking to determine the appropriate sentence

for a defendant and which help to maintain uniformity in sentencing throughout the country); United States v. Clark, No. 05-4274, 2006 WL 60273, at *1-2 (4th Cir. Jan. 12, 2006) (a sentencing court shall first calculate the range prescribed by the Guidelines and then consider that range as well as other relevant factors set forth in the Guidelines and § 3553(a) before imposing the sentence); United States v. Pho, Nos. 05-2455, 05-2461, 2006 WL 20574, at *10-11 (1st Cir. Jan. 5, 2006) (district court does not have authority to impose sentence outside advisory Sentencing Guideline range based solely on categorical policy-based rejection of Guidelines, as Congress and Sentencing Commission have authority over sentencing policy and seek to promote uniformity in federal sentences; judicial discretion over sentencing must be limited to case-specific circumstances); U.S. v. Fuller, 426 F.3d 556, 560 (2nd Cir. 2005) (a judge would commit statutory error in violation of section 3553(a) if the judge failed to consider the applicable Guidelines range and other factors listed in section 3553(a) in determining an appropriate sentence); United States v. Mooney, 425 F.3d 1093, 1100 (8th Cir. 2005) (Booker requires federal courts to start the sentencing process by calculating a Guideline sentence before considering other statutory factors); United States v. Gonzalez, No. 03-1129, 2005 WL 1427496, at *1 (3rd Cir. June 20, 2005) ("[a]lthough the Guidelines are no longer mandatory, we nonetheless begin our sentencing review with consideration of the applicable Guidelines range"); United States v. Shelton, 400 F.3d 1325, 1332 n.9 (11th Cir. 2005) ("the Federal Sentencing Guidelines remain an essential consideration in the imposition of federal sentences, albeit along with the factors in § 3553(a). A sentencing court under Booker still must consider the Guidelines, and, such consideration necessarily requires the sentencing court to calculate the Guidelines sentencing range in the same manner as before Booker.").

The duty of a district judge to articulate the reasons for his or her sentence can be subject to varying standards of review. This Court, like its colleagues, carefully studies all of this Circuit's decisions especially in the area of post-Booker sentencing law. A careful examination of these decisions reveals some inconsistencies. In general, as noted herein, our Circuit in Mykytiuk held that sentences that fall within a properly computed sentencing range are entitled to a "rebuttable presumption of reasonableness." Mykytiuk, 415 F.3d at 608. Furthermore, in United States v. Dean, 414 F.3d 725, 728-30 (7th Cir. 2005), Judge Posner indicated that a sentencing judge should discuss the application of the statutory factors to the defendant, not in check-list fashion, but with an adequate statement of the judge's reasons, consistent with § 3553(a), why the sentence that he or she selected is indeed appropriate for the particular defendant. Thereafter, in United States v. Rodriguez-Alvarez, 425 F.3d 1041, 1047-48 (7th Cir. 2005), the Seventh Circuit rejected the assertion that a detailed recitation of sentencing factors in § 3553(a) was necessary to support a higher end Guideline sentence. See also United States v. George, 403 F.3d 470, 472-73 (7th Cir. 2005) ("judges need not rehearse on the record all the considerations that 18 U.S.C. § 3553(a) lists").

However, in United States v. Cunningham, 429 F.3d 673, 676 (7th Cir. 2005), Judge Posner vacated a low end Guideline sentence and indicated for the first time that a sentencing judge cannot treat all sentences that would fall within the Guidelines sentencing range as reasonable per se. Instead, the judge must, if asked by either party, consider whether the Guidelines sentence actually conforms under the circumstances presented to the statutory factors enumerated in 18 U.S.C. § 3553 (a). In this Court's modest opinion, Cunningham appears to represent somewhat of a change of direction by our Circuit. Cunningham seems to strongly imply that district judges must discuss every potential argument made by a defendant at sentencing, as Judge Posner alluded to the standards

applied to decisions of administrative agencies and concluded that "[a] judge who fails to mention

a ground of recognized legal merit (provided it has a factual basis) is likely to have committed an

error or oversight." Cunningham, 429 F.3d at 679.

Exactly one week after the decision in Cunningham, however, the Seventh Circuit indicated

that the general sentencing standards were those that seemed to exist prior to Cunningham. In an

opinion authored by Chief Judge Flaum in United States v. Welch, 429 F.3d 702 (7th Cir. 2005), the

Seventh Circuit held that:

> The district court's explanation of its original sentence and its decision not to alter
> that sentence on remand was sufficient. The district court's sentence is within the
> Guidelines range, and the district court was not obligated to provide this Court with
> a detailed explanation of its consideration of each of the relevant factors. See United
> States v. Dean, 414 F.3d 725, 729-30 (7th Cir. 2005) (sentencing judge's "duty 'to
> consider' the statutory factors is not a duty to make findings"); United States v.
> George, 403 F.3d 470, 472-73 (7th Cir. 2005) ("[J]udges need not rehearse on the
> record all of the considerations that [18 U.S.C. § 3553(a) ] lists, as it is enough to
> calculate the range accurately and explain why (if the sentence lies outside it)
> defendant deserves more or less.").

Welch, 429 F.3d at 705. In addition, Chief Judge Flaum expressly noted that the Circuit Court's role

in the post-Booker sentencing regime was not that of the sentencing court. Welch, 429 F.3d at 705.

The Welch decision did not mention the Circuit's earlier Cunningham decision. Instead,

Chief Judge Flaum quoted from two other Seventh Circuit cases, United States v. Newsom, 428 F.3d

685, 687 (7th Cir. 2005), and United States v. Williams, 425 F.3d 478, 480 (7th Cir. 2005):

> The question is not how we ourselves would have resolved the factors identified as
> relevant by section 3553(a). Furthermore, given the presumptive reasonableness of
> sentences within the Guidelines range, we have observed that it will be the rare
> sentence within the Guidelines range that 'stands out as unreasonable.'

Welch, 429 F.3d at 705. Chief Judge Flaum noted that more explanation by sentencing judges, using

their post-Booker sentencing discretion, is always better than less; yet, he reiterated that any sentence

that is properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness. Welch, 429 F.3d at 705.

Similarly, in United States v. Brock, No. 03-2279, 2006 WL 39050 (7th Cir. Jan. 9, 2006), Chief Judge Flaum rejected a defendant's argument that a district court judge failed to give "meaningful consideration" to section 3553 sentencing factors where, after a Paladino remand, the district judge entered a single sentence order stating that he would not have sentenced the defendant to a different sentence if the Guidelines had been advisory. Chief Judge Flaum noted that it is enough that the record confirms that the judge has given meaningful consideration to the section 3553(a) factors. Brock, 2006 WL 39050, at *2 (citing Williams, 425 F.3d at 480.) The Seventh Circuit upheld Brock's thirty-year sentence because it concluded that, unlike in Cunningham, the district court's reasoning was supported by the initial sentencing transcript. The Brock Court expressly noted that while it is preferable that a district judge give a thorough explanation of its consideration of sentencing factors in its order after a Paladino remand, this effort was not mandated. Instead, as in Cunningham, Chief Judge Flaum indicated that when the Seventh Circuit "feels" that a district court's sentencing decision fails to show consideration of the section 3553 (a) factors and the parties' arguments, it will remand to the district court for more explanation. Brock, 2006 WL 39050, at*7.

In view of these somewhat contradictory opinions, it is at least the judgment of this author that in the final analysis, the Seventh Circuit's reasonableness review is somewhat subjective and dependent on how the Court of Appeals "feels" about a particular case. Therefore, out of an abundance of caution, this Court has taken the time to author this opinion and detail both its initial and final sentencing views in the hopes of fully complying with our Circuit's evolving subjective

standards. However, this Court is deeply concerned that district court judges may not always be able to devote their limited resources to these endeavors, especially when imposing sentences well within Sentencing Guidelines. These sentences are presumptively reasonable, and they are the product of over eighteen years' worth of federal criminal justice experience from all three branches of government, including the talented and dedicated staff members of the U.S. Sentencing Commission.

### The Defendants' Initial Sentences Are Reasonable

On remand, none of the parties have challenged this Court's application of the Sentencing Guidelines. The defendants instead just take a second bite at obtaining lower (non-Guideline) sentences by relying, in part, on their respective post-rehabilitation efforts. This Court, while commending the defendants' individual efforts at rehabilitation, must reject the defendants' post-Booker attempts to obtain lower sentences.

Initially, this Court notes that it must follow our developing Circuit precedent which requires the district court to limit its review during a Paladino remand to the record at the time of sentencing. Welch, 429 F.3d at 705-06. Post-sentencing events or conduct simply are not relevant to the Paladino inquiry. United States v. Re, 419 F.3d 582, 584 (7th Cir. 2005). Therefore, this argument, like the remainder of defendants' arguments in support of lower sentences, is invalid.

This Court agrees with the government's Paladino brief, which urges this Court to give substantial weight to the imposed Guideline sentences. As Judge Wood acknowledged in Mykytiuk, the Guidelines remain an essential tool in creating a fair and uniform sentencing system. 415 F.3d at 608. In fact, in United States v. Newsom, Judge Wood again emphasized that the Guidelines were intended to create national uniformity and that this goal remains important post-Booker. Newsom,

-22-

428 F.3d 685, 689 (7th Cir. 2005). Thus, it is not enough for a defendant to generally argue that a few cases from any particular circuit seem to cast doubt on his or her sentence. Id.

As indicated above, this Court's initial application of the Sentencing Guidelines at each of the defendants' sentencing hearings involved numerous contested issues of fact and law. This Court strongly believes that it followed a balanced Sentencing Guideline approach which considered the factors set forth in 18 U.S.C. § 3553(a) and emphasized each defendant's respective role in the egregious public corruption offenses as well as each defendant's relevant background. More importantly, as this Court indicated at sentencing, the Guideline range was reasonable for each defendant. Reviewing this range again, in light of all of the § 3553(a) factors, does not yield a different result as indicated below.

## A.    Michael Spano, Sr.

In this case, the Guideline range for defendant Spano applied by this Court provided for a sentence of sixty-three to seventy-eight months. This Court adhered to the Sentencing Guidelines and section 3553, and imposed a sentence of seventy-two months' imprisonment, above the mid-range of the calculated Guideline range. The record does not contain any reason to vary from the sentence that this Court originally imposed on Spano. This Court's decision to impose a seventy-two month sentence suggests that, even if the Guidelines were not being applied as mandatory, this Court would not have given a lesser sentence.

Indeed, this Court's observations at sentencing suggest the opposite. This Court emphasized section 3553's focus on the seriousness of the offense and the need to protect the public:

> "[The offense] took political corruption to a new level. I have never seen another
> case like this . . . . As far as I'm concerned with regard to this case, this is no different

than taking every single citizen in the Town of Cicero, locking them up in some room and saying you cannot leave until you hand over $20 to me . . .

(Sentencing Tr. at 53-54). In addition, this Court considered, but ultimately rejected, the government's motion for an upward adjustment based on Spano's alleged use of his organized crime ties to access the Town of Cicero and its public officials in furtherance of the charged offenses. In this Court's view, the government failed "to meet its burden of establishing some link by a preponderance of the evidence between the charged offenses and the alleged organized crime" ties. (Id. at 39.) This Court noted, however, that:

It is suspicious that Mr. Spano could all of a sudden get this contract out of all the individuals who can walk into the Town of Cicero; but mere suspicion is not enough to meet the burden of even preponderance of the evidence. It is not something that I can just use, regardless of how I feel about the Guideline ranges, to take these offenses and say that the offenses that occurred are outside of the heartland. I can't make that conclusion.

(Id. at 40.) It is thus clear from the record that in sentencing Spano under the applicable Guidelines range, this Court also properly considered the types of factors set forth in 18 U.S.C. § 3553 (a)(2). In fact, this Court specifically concluded that the Sentencing Guideline range for Spano was "totally appropriate for the offense that's before me. . . ." (Sentencing Tr. at 54.)

**B.    Emil Schullo**

As indicated above, the Guideline range for defendant Schullo applied by this Court provided for a sentence of thirty to thirty-seven months. This Court adhered to the Sentencing Guidelines, and imposed a sentence of thirty-seven months' imprisonment, at the highest end of the calculated Guideline range. In sentencing Schullo, this Court also considered and rejected an upward adjustment based on organized crime, because in this Court's view, "there's just no establishment that organized crime by any standard played a role in the offense." (Id. at 39-40.)

-24-

While Schullo, in his Sentencing Memorandum on Limited Remand ("Schullo Sentencing Memo"), recognizes that this "Court is bound by circuit precedent established in Paladino," Schullo nevertheless objects to the Paladino "sentencing process for its failure to comply with the mandates set forth in the Supreme Court opinion in Booker." (R. 311, Schullo Sentencing Memo at 2.) Citing decisions in the Fourth, Sixth and Ninth Circuits, namely United States v. Hughes, 396 F.3d 374 (4th Cir. 2005); United States v. Milan, 398 F.3d 445 (6th Cir. 2005); and United States v. Ameline, 400 F.3d 646 (9th Cir. 2005), Schullo urges this Court to find that the "limited remand" dictated by Paladino "is unconstitutional and in contravention of Booker." (R. 311, Schullo Sentencing Memo at 3.) While this Court believes the Paladino remand process is cumbersome because it requires a district judge to go back in time (in this case for a three-year period), this Court must reject defendant's importuning and comply with the Paladino process.[4]

As with defendant Spano, it is clear from the record that in sentencing Schullo under the applicable Guidelines range, this Court also considered the types of factors set forth in 18 U.S.C. § 3553(a)(2) in arriving at a proper sentence. This Court was especially concerned with promoting respect for the law and providing a punishment commensurate with the seriousness of the offense, as the defendants were able to steal public funds from the Town of Cicero thanks to the corrupt services of Schullo, who was supposed to be serving as Cicero's Chief of Police and Director of Public Safety. (Sentencing Tr. at 17-18.) Schullo abused his position of public trust and played a

---

[4]Additionally, all post-Booker appellate courts have acknowledged that district judges continue to have the right to make sentencing determinations that increase a defendant's sentence within the maximum authorized by a jury verdict. See, e.g., U.S. v. Bryant, 420 F.3d 652, 656 (7th Cir. 2005) (Sixth Amendment problem emerges only if judicial factfinding results in a sentence exceeding the statutory maximum, for example, or if such factfinding requires a particular sentence in the context of a mandatory sentencing guidelines scheme).

managerial role in the offense. (Id.) The record does not contain any reason to vary from the sentence that this Court originally imposed on Schullo. Even if this Court had not applied the Guidelines as mandatory, this Court would not have given a lesser sentence.

In fact, the findings by this Court make clear that if this Court were to impose a new sentence with its broad discretion under Booker, it might well sentence Schullo to a term of imprisonment in excess of the thirty-seven month sentence originally imposed. At sentencing, this Court stated: "I've already given you the benefit of one sentencing decision. I have to tell you that I find the Guideline range of thirty to thirty-seven months totally inadequate." (Id. at 56.) In sentencing Schullo, this Court also made perfectly clear that it believed the public corruption Guidelines to be insufficient, stating that: "[I]f I have anything to do with it, either now or in the future, this Sentencing Guideline range would be totally different than the one before me. I don't believe that the public corruption Guidelines are sufficient at this point in time nor have they been sufficient in the past." (Id. at 55.)

C.    **James Inendino**

The Guideline range for defendant Inendino applied by this Court provided for a sentence of sixty-three to seventy-eight months. (Sentencing Tr. at 14.) This Court adhered to the Sentencing Guidelines, and imposed a sentence of seventy-eight months' imprisonment, at the highest end of the calculated Guideline range. In sentencing Inendino, the Court considered and rejected motions by the government for upward departures based on: (1) organized crime ties; (2) the failure of Inendino's criminal history category to adequately reflect the seriousness of Inendino's sentence for a leadership role in the offense; and (3) obstruction of justice for paying a bribe to a Chicago official while on bond or for statements made to the probation officer in connection with Inendino's summary of the offense. (Id. at 6-7, 12-13, 21-22.)

As with defendants Spano and Schullo, the record demonstrates that the Court considered the types of factors set forth in 18 U.S.C. § 3553(a)(2) as well as the applicable Guidelines range in arriving at a proper sentence. In sentencing Inendino, the Court focused on the need to deter criminal conduct, promote respect for the rule of law, and protect the public from further crimes by Inendino. This Court stated:

> You've got six federal convictions at this point. . . . Now, this crime in Cicero, it's not the crime of the century; but it sure does and I said this before, reach new levels. It was the looting of the Town of Cicero. . . . So, taking all of this big mosaic into consideration, I need to send a message to you in no uncertain terms, Mr. Inendino, that you need to be retired totally from the federal criminal justice system.

(Sentencing Tr. at 29-33.)

While the record does not contain any reason to vary from the sentence this Court originally imposed, Inendino continues to insist – like at his sentencing hearing and in his summary of the offense (which was made part of the Presentence Investigation Report) – that: (1) he only received $3,100 from the scheme; (2) believed that "he was involved with a legitimate investigation for a valid reason of Cicero government;" (3) he never got the idea to bribe anyone or had anything to do with bribing anyone; and (4) he paid all his taxes due on the income he received from the offenses at issue. (R. 301, Sentencing Memorandum Pursuant to <u>United States v. Paladino</u> ("Inendino Sentencing Memo") at 4, 7.) Inendino argues that if this "Court considers the impact of <u>Booker</u>" and looks at what he calls his "real conduct," the Court will find that "it would not have given a sentence of seventy-eight (78) months absent an unconstitutional scheme of sentencing." (<u>Id</u>. at 7.)

Contrary to Inendino's arguments, which Inendino already raised at sentencing and which this Court unquestionably considered at that time, this Court would not have imposed less than a seventy-eight month sentence even if the Guidelines had not been applied as mandatory. In fact, this

Court's observations at sentencing clearly indicate the opposite. In sentencing Inendino, this Court made it perfectly clear that the length of the sentence imposed was "meant to totally retire" defendant Inendino. (Sentencing Tr. at 29.) This Court went on to state that: "You need to retire. Enough is enough, and the citizens of this district have had enough." (Id. at 33.) There is nothing in this ruling to suggest that this Court, having already given Inendino the benefit of numerous sentencing decisions "that probably many others would not," would have found a term of imprisonment of less than seventy-eight months sufficient to put an end to Inendino's criminal career. (Id.)

**D.  Necessity for Remand**

Based on the Seventh Circuit's own post-Booker standards, the defendants' sentences should have been affirmed without any need for re-evaluation by this Court or the creation of false expectations for Spano, Schullo, and Inendino. "[A] remand is necessary only when uncertainty otherwise would leave this court in a fog about what the district judge would have done with additional discretion." U.S. v. Lee, 399 F.3d 864, 866-67 (7th Cir. 2005) (no prejudice to a defendant and no need to remand where, among other circumstances, the district court states on the record that, if it had more leeway, it would have imposed a higher sentence; this may be indicated by the imposition of sentence at the top of a properly calculated range). This Court respectfully suggests that a review of the initial sentencing proceedings in this case would not leave an impartial reader with any doubt as to what this Court would do with its additional Booker discretion.

## CONCLUSION

It is appropriate to end this opinion at the same place this Court ended its statements at Inendino's sentencing over three years ago: "The citizens of this district have had enough." Sadly, the problem of public corruption has long plagued this federal district as well as the country, and has

continued during the three-year period since this Court's initial sentencing of the defendants. See, generally, John M. Broder, Amid Scandals, States Overhaul Lobbying Laws, N.Y. Times, Jan. 24, 2006 at A1, A19; James Dao, With Heady Days in the Past, Ex-Atlanta Mayor Faces Trial, N.Y. Times, Jan. 23, 2006 at A12; Jodi Wilgoren, Corruption Scandal Loosening Mayor Daley's Grip on Chicago, N.Y. Times, Jan. 6, 2006, at A1; and Richard Cahan, A Court That Shaped America Chicago's Federal District Court From Abe Lincoln to Abbie Hoffman (Northwestern University Press 2002) (reviewing our court's long and distinguished history and its unfortunate experience with political corruption cases). This Court alone has already sentenced far too many political officials and lawyers for public corruption crimes.

We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences. Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all – not only to the average citizen, but to all elected and appointed officials.

This Court hopes that this opinion will further the goal of deterrence; that the message will go out to all those individuals who are tempted to sell their offices or participate in any way in public corruption offenses – if you commit these crimes you will give up your freedom for a significant period of time. It is this Court's opinion that these persons who commit crimes in the halls of

government should be subject to the same consequences as those that commit crimes on the streets. Thus, courts must continue their vigilance in our nation's struggle against public corruption. See, e.g., United Status v. Paulus, 419 F.3d 693, 697-98 (7th Cir. Aug. 22, 2005) (upholding an upward non-Guideline sentence in significant public corruption case involving numerous bribes over an extended time period.) This Court fully agrees with the statements of its esteemed and capable senior colleague Judge John F. Grady, who recently stated: "[t]he matter of official corruption, bribery and shakedowns is an endemic problem. . . . The public needs to know that paying bribes . . . is conduct that will lead to serious punishment."[5]

Fortunately, this Court's desire to raise the Sentencing Guideline penalties for public corruption, as expressed at Schullo's sentencing, has since been realized. In November of 2004, new, increased public corruption penalties were unanimously passed by the United States Sentencing Commission and approved by Congress. These new penalties would have significantly increased the prison time for the defendants in this case. While this Court concludes that it would be unfair to apply these new penalties to the defendants via non-Guideline upward sentences, it is well-documented that this Court fully supports these increases and believes that these new public corruption Guideline increases are presumptively reasonable and entitled to substantial weight. See News Release, United States Sentencing Commission, Sentencing Commission Targets Corrupt Public Officials; Agency Also Takes Aim at Portable Rockets and Missiles (Mar. 22, 2004) (available at http://www.ussc.gov/PRESS/rel0304.htm) (quoting, Castillo, J.) ("Public corruption offenses are among the most harmful crimes against the system. At a time when the security of our

_____

[5]Quoted in, Rummana Hussain, 6 Months in Prison for Lying About Hired Truck Bribes, Chi. Sun-Times, December 8, 2005, at 18.

borders is paramount, the Commission wanted to send the strong message to those officials responsible for the security of our borders that any selling of their office would result in serious penalties. We must have zero tolerance for these types of offenses.")

For all these reasons, this Court determines that even with the additional sentencing discretion afforded by Booker, this Court would impose the original sentences. In this case, the nature and circumstances of the offenses and the relevant history and characteristics of each defendant fully justify the sentences imposed. Furthermore, sentencing the defendants below the Guideline range would subvert the goals of the U.S. Sentencing Commission and lead to unwarranted sentencing disparities which would in turn fail to protect the public. The Clerk is directed to transmit this opinion to the Court of Appeals.

ENTERED

Judge Ruben Castillo
United States District Court

DATED: January 24, 2006